1

2

3

4

5

6

# UNITED STATES DISTRICT COURT

7

### EASTERN DISTRICT OF CALIFORNIA

8

| GREGORY LYNN NORWOOD, | CASE NO. 1:08-cv-00059-AWI-GBC (PC) |
|---|---|

9

| Plaintiff, | FINDINGS AND RECOMMENDATIONS TO |

10

GRANT DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT AND TO DISMISS

v.

11

ACTION, WITH PREJUDICE

JAMES E. TILTON, et al.,

12

Doc. 50

Defendants.

13

_____/   OBJECTIONS DUE WITHIN FIFTEEN DAYS

14

15                          **Findings and Recommendations**

16              **I. Procedural Background and *Woods v. Carey***

17          On January 14, 2008, Plaintiff, a state prisoner proceeding pro se and in forma pauperis, filed

18  this civil rights action pursuant to 42 U.S.C. § 1983. Doc. 1. On December 2, 2010, the Court

19  ordered this action to proceed on a cognizable Eighth Amendment claim for deprivation of outdoor

20  exercise against Defendants Tilton, W. J. Sullivan, G. Schulteis, F. Gonzalez, M. Carrasco, J.

21  Peterson, K. Prior, P. Matzen, D. Zanchi, G. A. Magallanes, J. Jones and Doe Regional Director.

22  Doc. 23.[1]

23          On December 27, 2010, the Court issued a second informational order, advising Plaintiff that

24  Defendants may file a motion for summary judgment and how Plaintiff must oppose the motion in

25  _____

26          [1] In the Court's order, the Court notified Plaintiff that he must amend his complaint once he identifies the Doe
defendant. Doc. 23. Plaintiff has never amended his complaint to identify the Doe defendant Regional Director, and thus,

27  the undersigned recommends that the Court also grant summary judgment as to the unidentified Doe defendant Regional
Director. The analysis within these findings and recommendations would also apply to the Doe defendant, and Plaintiff

28  has failed to amend his complaint and serve the Doe defendant within the 120-day period prescribed by Rule 4(m) of
the Federal Rules of Civil Procedure.

order to avoid dismissal, pursuant to *Rand v. Rowland*, 154 F.3d 952 (9th Cir. 1998). Doc. 26. On July 6, 2012, the Ninth Circuit found that the notice and warning of requirements for opposing a defendant's motion for summary judgment should be issued contemporaneously when a defendant files a motion for summary judgment, as opposed to a year or more in advance. *Woods v. Carey*, 684 F.3d 934, 936 (9th Cir. 2012). On July 20, 2012, Defendants filed a motion for summary judgment in conjunction with a notice pursuant to *Rand* and *Woods* and statement of undisputed facts. Docs. 50, 51. On August 20, 2012, Plaintiff filed a two-hundred and ten (210) page opposition to the motion for summary judgment including a statement of undisputed facts, a declaration, and exhibits. Doc. 54. On August 24, 2012, Defendants filed a reply. Doc. 55.

## II. Legal Standard for Summary Judgment

Summary judgment is appropriate when it is demonstrated that there exists no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Under summary judgment practice, the moving party [A]lways bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'" *Id.* If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. Fed. R. Civ. P. 56(c); *Matsushita*, 475 U.S. at 586 n.11. In resolving the summary judgment motion, the Court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any. Fed. R. Civ. P. 56(c). Finally, to demonstrate a genuine issue, the opposing party "must do more than simply

show that there is some metaphysical doubt as to the material facts. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587.

### III. Plaintiff's Response to Motion for Summary Judgment

In Plaintiff's opposition to the motion for summary judgment, he denies various allegations by Defendants, contending there were no status reports of the various incidents; inadequate information; that Plaintiff is without sufficient information to deny the incidents; on the basis of speculation; no credibility; or pretextual. Pl. Opp'n at 12-42, Doc. 54.

In response to a motion for summary judgment, a plaintiff cannot simply restate his allegations from the complaint. *See Beard v. Banks*, 548 U.S. 521, 534 (2006) (citing Fed. R. Civ. P. 56(e)). Rule 56(e)(2) of the Federal Rules of Civil Procedure provides that "[w]hen a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must-by affidavits or as otherwise provided in this rule-set out specific facts showing a genuine issue for trial. If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party." Fed. R. Civ. P. 56(e). If the moving party's statement of facts are not controverted in this manner, a court may assume that the facts as claimed by the moving party are admitted to exist without controversy. *Beard*, 548 U.S. at 527. The Court "is not required to comb through the record to find some reason to deny a motion for summary judgment." *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001) (quoting *Forsberg v. Pac. Northwest Bell Tel. Co.*, 840 F.2d 1409, 1418 (9th Cir.1988)). Instead, the "party opposing summary judgment must direct the Court's attention to specific triable facts." *S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 889 (9th Cir. 2003). Statements in a brief, unsupported by the record, cannot be used to create an issue of fact. *Barnes v. Independent Auto. Dealers*, 64 F.3d 1389, 1396 n.3 (9th Cir. 1995).

In opposing summary judgment, Plaintiff cannot simply deny the existence of the facts put forth in Defendants' declarations without bringing forth his own supporting evidence. Arguing that there were no status reports of the various incidents; inadequate information; being without sufficient information to deny the incidents; speculation; credibility; or pretextual is insufficient to controvert

1  declarations submitted under oath. Thus, where Plaintiff makes these insufficient arguments, the

2  Court will consider Defendants' declarations as statements of fact, as uncontroverted in the record.

3  Fed. R. Civ. P. 56(e).

4  **IV. Relevant Allegations in the Record for Eighth Amendment Outdoor Exercise**

5  **A. Undisputed Facts from Defendants' Statement of Facts and Plaintiff's Opposition**

6  Plaintiff is an inmate in the custody of the California Department of Corrections and

7  Rehabilitations ("CDCR"). (Norwood Depo. 12:6-16; Defs. UF 1, Doc. 51.) At all times relevant to

8  this suit, Norwood was housed in Facility IVA at the California Correctional Institution ("CCI") in

9  Tehachapi, California. (Defs. UF 2, Doc. 51; Pl. Opp'n at 12, Doc. 54.) CDCR classifies inmates

10  based on their commitment offense and / or in-prison behavior, with the highest security level being

11  level IV. This lawsuit concerns a modified program in Facility IVA at CCI, which houses Levels III

12  and IV inmates. (Defs. UF 3; Pl. Opp'n at 12.)

13  Defendant Tilton was the Secretary for CDCR. He was responsible for overseeing the

14  management and control of the state's correctional system, which included 33 state prisons, 44

15  conservation camps, and more than 190 parole units and sub-units in 85 locations. Defendant Tilton

16  was responsible for managing a staff which numbered more than 50,000. (Defs. UF 4; Pl. Opp'n at

17  12.) Defendants are Tilton, Secretary for CDCR; Sullivan, Warden at CCI; Gonzalez and Schulteis,

18  Chief Deputy Wardens at CCI; Carrasco, Associate Warden at CCI; Zanchi, Captain at CCI; Jones,

19  Magallanes, Matzen, Peterson, and Prior, Correctional Lieutenants at CCI. (Defs. UF 5-14, Doc. 51;

20  Pl. Opp'n at 12-13, Doc. 54.) Plaintiff states that in Warden Sullivan's absence, Gonzalez and

21  Schulteis serve as wardens in acting capacity. (Pl. Opp'n at 12.)

22  **1. Background on Modified Programming**

23  Normal programming at a prison means inmates attend work and education programs; have

24  regular visiting, canteen, and telephone privileges; can attend the law library and religious services;

25  and are released to the yard for recreation in large groups according to their yard schedule. (Defs. UF

26  15, Doc. 51; Pl. Opp'n at 13, Doc. 54.)

27  CDCR policies and procedures direct that when a serious incident occurs, the priorities are

28  to: (1) isolate, contain, and control the situation to the smallest possible area; (2) provide medical

attention to all injured persons; (3) preserve all available evidence; (4) identify all involved persons; and (5) complete and submit appropriate written documentation and reports within the designated time frames. Defendants always complied with, and directed their subordinate staff to comply with, these directives. (Defs. UF 16; Pl. Opp'n at 13.)

A modified program typically involves the suspension of various programs and services for a specific group of inmates or a specific part of a facility. (Defs. UF 17; Pl. Opp'n at 13.) Modified programs are necessary when correctional staff discover evidence or receive information that violence or disruptions are being planned by some inmates against other inmates or staff, or that there exists a serious threat to institutional security or the safety of inmates and staff. Work and education programs, visiting and dayroom privileges, and outdoor yard time may be suspended; and telephone, canteen, and religious programming may be restricted. (Defs. UF 17; Pl. Opp'n at 13-14.) Essential services, including medical services, mental health services, and hygiene, are maintained. The modified program plan is reviewed regularly and revised as necessary. (Defs. UF 17; Pl. Opp'n at 14.)

After the initial incident response is completed, the incident is assessed to determine whether it is necessary to modify or restrict programming activities for some or all inmates. If the incident is serious, it may be necessary to modify or restrict program activities for some or all inmates by: (1) declaring a State of Emergency; (2) locking down an entire facility or portions of a facility; or (3) placing some or all of the facility on a modified program. (Defs. UF 18; Pl. Opp'n at 14.) When inmates commit an assault, staff must determine whether the assault was an isolated incident or the beginning of a coordinated campaign of violence involving many inmates. (Defs. UF 19; Pl. Opp'n at 14.)

All breaches of security, threats of violence, and disruptions are taken seriously, but there is greater concern if there is evidence or information that an assault or threat to safety or institutional security may be part of a greater scheme because it could lead to a larger-scale incident or security breach, creating a more serious threat to the safety and security of the prison. (Defs. UF 20; Pl. Opp'n at 15.) Plaintiff agrees that this may be the normal course but denies that is what occurred here. (Pl. Opp'n at 15.) Staff must determine the likelihood that future violence will occur and the

nature and causes of the violence. (Defs. UF 20; Pl. Opp'n at 15.)

CDCR implements lockdowns and modified programs when they are necessary to maintain safety and security in the prisons, and to protect the lives of inmates and staff. The purpose of lockdowns and modified programs is not to discipline inmates. (Defs. UF 22; Pl. Opp'n at 15-16.) Decisions to implement lockdowns or modified programs are usually based on numerous situation-specific facts. Only by evaluating incidents on a case-by-case basis can prison officials determine when a prison must be locked down or a group of inmates placed on a modified program; when normal programs, including outdoor exercise, should be suspended for particular inmates; or when and how normal programming can be safely resumed. (Defs. UF 22; Pl. Opp'n at 16.)

Typically, after a precipitating incident, the modified program or lockdown committee meets, assesses the risk to institutional safety and security, and determines what areas of the prison are affected, which investigations must be conducted, whether to interview staff and inmates, and how to collect relevant intelligence. (Defs. UF 23; Pl. Opp'n at 16-17.) The committee then submits a recommendation, which may include a request to continue or adjust a modified program. The Warden, or his designee, approves or rejects the recommendation. (Defs. UF 23; Pl. Opp'n at 17.)

Once a modified program is implemented, the process of investigating and gathering intelligence begins. (Defs. UF 25; Pl. Opp'n at 17-18.) The yards, cells, common areas, and other areas of the prison are searched thoroughly for evidence, weapons, and contraband. Mail is screened for any information concerning planned violence. Each piece of evidence and information obtained from either a search or interview is examined and all leads are followed, which often creates the need for additional searches and interviews. (Defs. UF 25; Pl. Opp'n at 18.) Plaintiff states that searches and screening of mail should not warrant more searches because staff often misconstrues letters written by inmates. (Pl. Opp'n at 18.)

During any modified program, there are daily mandatory meetings with the Warden or designee, Chief Deputy Warden, Facility Captain, Associate Warden, the Institutional Gang Investigation Unit, and any line staff member with relevant information. The attendees discuss the progress of the investigation, the status of the modified program, and the development of a plan to resume normal programming. (Defs. UF 26; Pl. Opp'n at 18-19.)

Among all of the programming activities that are suspended during a modified program, it is most difficult to determine when exercise programs can safely be resumed. Following a return to a normal program, violence is most likely to occur on an exercise yard. (Defs. UF 28; Pl. Opp'n at 20.) Plaintiff denies that violence will necessarily occur on a mini concrete yard once inmates are strip-searched at their cells, in the same way administrative segregation (ad-seg) and security housing unit (SHU) inmates are allowed to attend mini-concrete yards. (Pl. Opp'n at 20.)

Inmates have the greatest access to each other on the exercise yards, which is typically where most assaults occur. Self-imposed ethnic divisions are especially pronounced on the exercise yards because the various ethnic groups often claim areas of the yard as their turf. The number of inmates on a yard greatly outnumbers the correctional staff members assigned to monitor the area. (Defs. UF 28; Pl. Opp'n at 20.) Plaintiff contends that when mini-concrete yards were given, inmates were allowed in small groups to attend with their own race. On the main exercise yard, inmates have designated areas for certain races. (Pl. Opp'n at 20.)

Until an investigation during the modified program identified and resolved the threat to safety and institutional security, the small concrete exercise yards at CCI were not an alternative to the main exercise yard. (Defs. UF 29; Pl. Opp'n at 20.) Plaintiff denies this allegation and states that the perpetrator of the October 7, 2006 assault and his cellmate were receiving mini concrete yard ten (10) days after the assault for up to ten (10) hours weekly. Plaintiff states that twenty (20) unrestrained African-Americans should have been able to access the mini concrete yards because they were allowed unrestrained inside the medical facility and law library and other races were on normal program. (Pl. Opp'n at 20.)

If inmates are released prematurely from the modified program, they could be subjected to assaults, coercion, or forced to hide inmate-manufactured weapons. The relevant inquiry is when inmates can safely resume outdoor exercise, not where inmates can attend outdoor exercise under an unreasonable risk of harm. (Defs. UF 29; Pl. Opp'n at 21.) Plaintiff states there is no evidence that any African-American inmate was assaulted or coerced. (Pl. Opp'n at 21.)

The discovery of inmate-manufactured weapons at the prison creates additional threats to institutional security that must be evaluated including, but not limited to, the type of weapon stock

1   used, how they were manufactured, and their intended targets. (Defs. UF 30; Pl. Opp'n at 21.)

2   Plaintiff states assaults are infrequent and the fact that an inmate has a weapon does not mean he will

3   use it. (Pl. Opp'n at 21.)

4          Inmates associate along racial lines. Members of each racial or ethnic group tend to

5   congregate and associate exclusively among those belonging to their own racial group. Levels IV

6   and III general inmate populations are highly structured by prison and street gangs and an organized

7   effort between races on these types of facilities is rare. (Defs. UF 31; Pl. Opp'n at 21-22.) Such

8   organized efforts are often carried out by members of a single racial group working together. Further,

9   it is not uncommon for inmates to hide or pass weapons, or attempt to carry out an assault, for

10  another inmate of the same racial group. And inmates who are not affiliated with a gang often are

11  pressured by gang members to assist them in violent activities. The threats are directed not only to

12  the inmates, but also to their non-incarcerated family and friends. (Defs. UF 31; Pl. Opp'n at 22.)

13  Plaintiff denies this contention because in discovery responses, Defendants were screening non-

14  affiliated inmates for release from the modified program. (Pl. Opp'n at 22.)

15         When inmates planning violence realize that facility searches are ongoing and that the

16  weapons they have hidden will eventually be discovered and confiscated, they sometimes threaten

17  violence against other inmates of their same race to coerce them to move or hide weapons to prevent

18  them from being discovered, or to assault other inmates or staff. In such situations, if the pressured

19  inmate does not comply, violent acts may be carried out against him. (Defs. UF 33; Pl. Opp'n at 22-

20  23.) Plaintiff denies this as the threats at CCI 4A involved gang members, and all African-American

21  inmates were unrestrained in the law library, medical facility, classification, showers, etc., yet no

22  listed assaults occurred. Inmates were unrestrained from November 27, 2006 to December 28, 2006,

23  making this contention pretextual. (Pl. Opp'n at 23.)

24         Consequently, it is sometimes necessary to lock down or place on modified program inmates

25  who may not have directly participated in the triggering incident to protect them from members of

26  their own race. (Defs. UF 33; Pl. Opp'n at 23.) Plaintiff denies that this occurs because the inmate

27  could seek protective custody. Defendants cannot contend that this occurred throughout the October

28  2006 through February 2007 lockdown. (Pl. Opp'n at 23.)

At the same time, there are times at CCI when unaffiliated African-American inmates are forced to engage in disruptive group activities, and inmates have been assaulted for refusing to do so. (Defs. UF 36; Pl. Opp'n at 24.) Plaintiff contends staff had the opportunity to see that this did not occur from November 26, 2006 through December 28, 2006, when inmates were unrestrained. (Pl. Opp'n at 24.)

Moreover, there are times when some disruptive groups or prison gangs will work together in concert for a common purpose. For example, there have been instances where the African-American inmates from different disruptive groups have worked together to assault staff. (Defs. UF 37; Pl. Opp'n at 24.) Plaintiff contends that Defendants have no evidence that the October 7, 2006 assault was anything but isolated. On October 23, 2006, the perpetrator wrote two letters in ad-seg explaining how and why he assaulted the staff member. (Pl. Opp'n at 24.)

Modified programs imposed on a particular racial or ethnic group are sometimes necessary until prison officials can determine whether the incident has a racial component or will likely lead to broader racial or ethnic violence. (Defs. UF 38; Pl. Opp'n at 25.)

**2. Defendants' Roles Regarding Modified Program Number CCI-IVA-06-038**

At all times relevant to this suit, Sullivan, Gonzalez, and Schulteis were the only correctional staff member at CCI with the power to modify or terminate the modified program. (Defs. UF 40; Pl. Opp'n at 26.) Sullivan implemented, adjusted, and terminated the modified programs in this case. (Defs. UF 41; Pl. Opp'n at 26.)

With respect to modified program number CCI-IVA-06-038, Carrasco, Jones, Magallanes, Matzen, Peterson, Prior, and Zanchi were responsible for reviewing the evidence gathered by subordinate staff and assessing the threat of violence at the prison. (Defs. UF 42; Pl. Opp'n at 26.) Carrasco, Jones, Magallanes, Matzen, Peterson, Prior, and Zanchi did not have the authority to implement, adjust, or terminate modified program number CCI-IVA-06-038, and they did not implement, adjust, or terminate modified program number CCI-IVA-06-038. (Defs. UF 43-44; Pl. Opp'n at 26.)

Tilton played no role in the approval or disapproval of any aspect of modified program number CCI-IVA-06-038. (Defs. UF 45; Pl. Opp'n at 27.)

### 3. Facts Regarding Modified Program Number CCI-IVA-06-038

On October 1, 2006, correctional staff observed that some African-American inmates attending outdoor exercise in Facility IVA were counting the number of staff monitoring them. (Defs. UF 46; Pl. Opp'n at 27.) Through experience at CCI, correctional staff recognize that this type of behavior often precedes violent attacks on inmates or staff. (Defs. UF 46; Pl. Opp'n at 27.) Because correctional staff members were concerned these inmates could be planning to assault correctional staff or other inmates, staff retrieved a 40 mm direct impact weapon, ended the outdoor exercise session, and recalled all inmates back to their assigned housing units. (Defs. UF 46; Pl. Opp'n at 27.)

On October 7, 2006, an African-American inmate attempted to murder a correctional staff member by stabbing him twice in the head with an inmate-manufactured weapon during outdoor exercise in Facility IVA. (Defs. UF 47; Pl. Opp'n at 27-28.) As correctional staff members were conducting an emergency yard recall, they discovered that another African-American inmate was armed with an inmate-manufactured weapon. The African-American inmate told staff, "The weapon was meant for you guys." (Defs. UF 48; Pl. Opp'n at 28.) This inmate was the cellmate of the perpetrator. (Pl. Opp'n at 28.)

On October 7, 2006, modified program number CCI-IVA-06-038 began. The modified program applied to all of the inmates in Facility IV. (Defs. UF 49; Pl. Opp'n at 28.) During the modified program, inmates and facility staff were interviewed to gather intelligence about the cause(s) of the violence. The yards, cells, common areas, and other areas of the prison were searched thoroughly for evidence, inmate-manufactured weapons, and contraband. Mail was screened for any information concerning planned violence. Each piece of evidence and information obtained from either a search or interview was examined and all leads were followed. (Defs. UF 50; Pl. Opp'n at 28-29.)

Between October 10, 2006 and October 26, 2006, staff conducted interviews and searches in Facility IV. (Defs. UF 52-67; Pl. Opp'n at 29.) On October 21, 2006, ten inmates claimed their razors were wrongfully confiscated during the cell searches. (Defs. UF 62; Pl. Opp'n at 29.) The correctional staff member speaking with these inmates did not issue new razors, because he was

1  concerned the inmates could be manipulating the razor exchange to create inmate-manufactured

2  weapons. (Defs. UF 62; Pl. Opp'n at 29.) An African-American inmate responded to the correctional

3  staff member by saying, "I'll hurt you. I will make it hurt." (Defs. UF 62; Pl. Opp'n at 30.)

4          On October 26, 2006, Caucasian, Hispanic, and Other (under prison regulations, inmates that

5  are not African-American, Caucasian, or Hispanic are classified as "Other") inmates began a phased

6  return to a normal program because the investigation and searches associated with modified program

7  number CCI-IVA-06-038 did not reveal any evidence that suggested they were planning violence

8  against correctional staff or other inmates. (Defs. UF 68; Pl. Opp'n at 30.)

9          On October 29, 2006, a correctional staff member smelled the odor of burning plastic or

10  rubber in Housing Unit 3C, which was significant because the weapon used to assault staff on

11  October 7, 2006, was made from melted plastic. (Defs. UF 69; Pl. Opp'n at 30.) A search of Housing

12  Unit 3C did not reveal the source of the odor. (Defs. UF 69; Pl. Opp'n at 30.)

13          On October 31, 2006, staff reported that an unusual number of African-American inmates

14  were refusing to exit their cells to take a shower. Correctional staff were concerned by this

15  development because inmates sometime refuse to attend showers to avoid violence organized by

16  inmates against other inmates or staff. (Defs. UF 70; Pl. Opp'n at 30-31.) Inmates are only allowed

17  to shower when their cellmates also shower. (Pl. Opp'n at 31.)

18          On November 1, 2006, an Institutional Gang Investigator received a note that said

19  unidentified members of the African-American inmate population were attempting to organize an

20  assault on staff. (Defs. UF 71; Pl. Opp'n at 31.)

21          On November 2, 2006, an African-American inmate threatened a Correctional Officer. He

22  said, "I am coming to see you when I get out. The only way to get rid of me is to kill me." Based

23  upon the threat, the inmate was transferred to the prison's Administrate Segregation Unit. During

24  his escort, the inmate said, "I ain't no ordinary [expletive]. All I got to do is make one phone call and

25  I got people up here to take care of this [expletive]." (Defs. UF 72; Pl. Opp'n at 31-32.) This inmate

26  was a Crip gang member. (Pl. Opp'n at 32.)

27          On November 2, 2006, staff smelled burning plastic in Housing Unit C1. (Defs. UF 73; Pl.

28  Opp'n at 32.) On November 3, 2006, staff smelled burning plastic in Housing Unit A2. (Defs. UF

74; Pl. Opp'n at 32.) On November 5, 2006, staff began a new series of searches to locate both the source of the smells of burning plastic and inmate-manufactured weapons. (Defs. UF 76; Pl. Opp'n at 32.) Also on November 5, 2006, staff reported that only half of the African-American population attended showers. In addition, staff smelled burning plastic in Housing Unit C3. (Defs. UF 75; Pl. Opp'n at 32.)

On November 6, 2006, staff searched Housing Unit C1. (Defs. UF 77; Pl. Opp'n at 32.) Staff discovered evidence that two African-American inmates were burning unknown items in their cell. Staff discovered a burnt electrical outlet, large paper bag with soot inside, and a milk carton containing baby oil and soot. (Defs. UF 77; Pl. Opp'n at 32.) Based upon the evidence, staff believed the baby oil was burned to melt plastic. The searches also revealed the pointed tip from a nail clipper and the top of a plastic cup was missing from another cell. Staff believed these items could be combined into a plastic inmate-manufactured weapon with a metal tip as a point. (Defs. UF 77; Pl. Opp'n at 33.) While the searches produced evidence that inmates were manufacturing weapons, staff was unable to locate any inmate-manufactured weapons. (Defs. UF 77; Pl. Opp'n at 33.)

On November 8, 2006, staff searched Housing Unit C3. (Defs. UF 79; Pl. Opp'n at 33.) Staff did not discover any inmate manufactured weapons, but they located glass jars, wicks, and a flammable liquid that appeared to be baby oil. Based on the evidence, staff believed that inmates were burning the baby oil to melt plastic and manufacture weapons. (Defs. UF 79; Pl. Opp'n at 33.)

Because the investigation and searches associated with modified program number CCIIVA-06-038 did not reveal any tensions or planned violence between Caucasian, Hispanic, and Other inmates or correctional staff, Caucasian, Hispanic, and Other inmates returned to a normal program on November 9, 2006. (Defs. UF 80; Pl. Opp'n at 33.)

On November 12, 2006, an African-American inmate battered another African-American inmate. (Defs. UF 81; Pl. Opp'n at 34.) Both inmates were associated with the Bloods prison disruptive group. During an inventory of the assaulting inmate's property, staff discovered an inmate-manufactured weapon in his bedding. (Defs. UF 81; Pl. Opp'n at 34.)

On November 17, 2006, two African-American inmates affiliated with the Crips prison disruptive group were aggressive toward staff. (Defs. UF 82; Pl. Opp'n at 34.) As correctional staff

attempted to escort the inmates to the prison law library, the inmates were uncooperative, refused to be placed in escort restraints, and told staff that "the cops were scared." (Defs. UF 82; Pl. Opp'n at 34.) Inmates believed that staff were over-zealous in carrying out their duties, when the inmates in general population had nothing to do with the October 7, 2006 assault. (Pl. Opp'n at 34.) Upon being returned to his cell, one of the aggressive inmates thrust his hands through the food port in the cell door, clenched his fists, and flexed his muscles. (Defs. UF 82; Pl. Opp'n at 34.)

Between November 18 and November 27, 2006, staff continued to attempt to identify the unidentified African-American inmates attempting to foment violence at the prison and search for inmate manufactured weapons. (Defs. UF 83; Pl. Opp'n at 34.)

On November 30, 2006, staff from the prison Investigation Services Unit reported that the most recent investigations did not produce any new evidence that African-American inmates were planning violence against staff, but by this time, the African-American inmate population was also aware that their correspondence and activities were being closely monitored by staff. (Defs. UF 84; Pl. Opp'n at 35.) Staff ordered that African-American inmates could start a return to a normal program, but the investigations would need to continue because staff remained concerned that unidentified African-American inmates might attempt to assault staff after all inmates returned to a normal program. (Defs. UF 84; Pl. Opp'n at 35-36.)

On December 2, 2006, and December 3, 2006, African-American inmates were escorted to the visiting area without incident. (Defs. UF 85; Pl. Opp'n at 36.)

On December 5, 2006, Facility IVA began a second modified program, number CCI-IVA-06-049, after several Hispanic inmates battered an inmate with an inmate-manufactured weapon. (Defs. UF 86; Pl. Opp'n at 36.) During recall of the yard, staff discovered a second battered inmate and several inmate-manufactured weapons. (Defs. UF 86; Pl. Opp'n at 36.)

Between December 5, 2006, and December 22, 2006, the searches for additional inmate-manufactured weapons and interviews associated with modified program number CCI-IVA-06-049 slowed the progress of the investigation and phased return to a normal program associated with modified program number CCI-IVA-06-038. (Defs. UF 86; Pl. Opp'n at 36.)

On December 26, 2006, African-American inmates began to attend outdoor exercise one yard

at a time. (Defs. UF 87; Pl. Opp'n at 37.) Plaintiff's housing unit did not have outdoor exercise until February 1, 2007. (Pl. Opp'n at 37.)

On December 28, 2006, correctional staff discovered an anonymous note that said African-American inmates affiliated with the Crips disruptive group were planning to commit violence upon a return to a normal program. (Defs. UF 88; Pl. Opp'n at 37.) Based upon this information, all African-American inmates were placed back on a modified program. Correctional staff searched the cells of all the inmates identified in the note, but no serious contraband was located. (Defs. UF 88; Pl. Opp'n at 37.)

On December 29, 2006, staff received evidence regarding the possible identity of the author of the December 28, 2006 note and the possibility that the note was designed to manipulate staff. (Defs. UF 89; Pl. Opp'n at 37.) The investigations associated with modified program number CCI-IVA-06-038 revealed that an inmate who had security concerns with other inmates at the prison might be seeking to manipulate staff to transfer some Crips disruptive group members to the Administrative Segregation Unit of the prison. (Defs. UF 89; Pl. Opp'n at 38.)

On December 29, 2006, staff received another anonymous note that indicated African-American inmates were conspiring to assault staff. (Defs. UF 90; Pl. Opp'n at 38.)

Between December 30, 2006, and January 1, 2007, staff conducted a new series of interviews with all of the African-American inmates in Facility IVA to assess the credibility of the two anonymous letters and whether it was safe to resume a normal program. (Defs. UF 91; Pl. Opp'n at 38.) Based on the evidence collected, staff could not conclusively determine whether the notes were credible. (Defs. UF 91; Pl. Opp'n at 38.)

On January 4, 2007, the thirteen inmates identified in the December 28, 2006 note were transferred to the Administrative Segregation Unit pending further investigation. (Defs. UF 92; Pl. Opp'n at 38-39.)

On January 5, 2007, staff attending the modified program meeting recommended to slowly return African-American inmates to a normal program beginning on January 9, 2007. (Defs. UF 93; Pl. Opp'n at 38.)

On January 9, 2007, staff searched all of the showers and shower vents in Housing Units 1

through 5 based upon concerns that inmates had hidden weapons in these locations. (Defs. UF 94; Pl. Opp'n at 39.)

On January 10, 2007, staff continued to assess the safest way to restore normal program for the African-American inmate population. Staff recommended starting with phone calls, normal visiting, and not using restraints during escorts. (Defs. UF 95; Pl. Opp'n at 39.)

On January 11, 2007, modified program number CCI-IVA-06-038 was changed to allow African-American inmates to be escorted without restraints, normal phone calls, and normal visiting. (Defs. UF 96; Pl. Opp'n at 39.) Staff were ordered to closely monitor the program for any signs that inmates were planning to commit violence. (Defs. UF 96; Pl. Opp'n at 39.)

On January 12, 2007, staff reported that some outgoing inmate letters suggested that unidentified African-American inmates were still planning to assault staff. The modified program was slightly changed to reflect that one inmate could be escorted by two staff members, after an unclothed body search, and the inmate's hands must remain in his pockets during the escort. (Defs. UF 97; Pl. Opp'n at 39-40.)

On January 16, 2007 the modified program was changed to permit inmates to keep their hands behind their backs during escorts because the phased return to a normal program continued without incident. (Defs. UF 98; Pl. Opp'n at 40.) Later in the day, an ongoing investigation to locate weapons and other intelligence at the prison revealed that a cell occupied by African-American inmates contained five nails, a sharpened paper clip, a desk that was missing metal, concrete scrape marks consistent with weapon sharpening, materials to melt plastic, and letters that reflected animosity toward staff. (Defs. UF 98; Pl. Opp'n at 40.)

On January 17, 2007, the phased return to a normal program was briefly suspended to permit staff to conduct additional searches based upon the new information provided by the Institutional Gang Investigator on January 16, 2007. (Defs. UF 99; Pl. Opp'n at 40.)

On January 18, 2007, staff reviewed a letter suggesting that African-American inmates may still be planning to assault staff. (Defs. UF 100; Pl. Opp'n at 40.)

On January 20, 2007, the searches ordered on January 17, 2007 were completed without incident. Accordingly, modified program number CCI-IVA-06-038 was changed to resume

1  non-contact visiting. (Defs. UF 101; Pl. Opp'n at 41.)

2  Between January 21, 2007, and January 24, 2007, staff determined it was necessary to search

3  five sections of the prison based on concerns that inmates possessed inmate manufactured weapons.

4  (Defs. UF 102; Pl. Opp'n at 41.)

5  On January 24, 2007, correctional staff identified an African-American inmate that appeared

6  to be fomenting violence at the prison. (Defs. UF 103; Pl. Opp'n at 41.) The inmate was

7  circumventing the prison mail procedures to write to inmates that participated in a conspiracy to

8  assault staff and condemned inmates. (Defs. UF 103; Pl. Opp'n at 41.) Staff removed the inmate

9  from the general population and moved him to the Administrative Segregation Unit of the prison,

10  with a recommendation to transfer him to another facility. A search of the inmate's cell revealed an

11  inmate-manufactured weapon. (Defs. UF 103; Pl. Opp'n at 41.) Defendants do not state whether this

12  inmate was affiliated or unaffiliated. (Pl. Opp'n at 41.)

13  On January 25, 2007, modified program number CCI-IVA-06-038 was changed to allow

14  inmates to be escorted unrestrained with only visual monitoring, normal visiting, and normal phone

15  calls. (Defs. UF 104; Pl. Opp'n at 42.)

16  On February 1, 2007, correctional staff identified three additional African-American inmates

17  who appeared to be fomenting violence at the prison. (Defs. UF 105; Pl. Opp'n at 42.) The inmates

18  were placed in the Administrative Segregation Unit. Next, the modified program was changed to

19  permit outdoor exercise one section at a time, with the inmates closely monitored for safety. (Defs.

20  UF 105; Pl. Opp'n at 42.)

21  Between February 2, 2007, and February 6, 2007, each day, African-American inmates from

22  one section of Facility IVA attended outdoor exercise without incident. (Defs. UF 106; Pl. Opp'n

23  at 42.)

24  On February 7, 2007, modified program number CCI-IVA-06-038 ended. (Defs. UF 107; Pl.

25  Opp'n at 43.)

26  //

27  //

28  //

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### V. Legal Standard and Analysis for Plaintiff's Claim

### A. Eighth Amendment Outdoor Exercise

### 1. Legal Standard

"[W]hile conditions of confinement may be, and often are, restrictive and harsh, they 'must not involve the wanton and unnecessary infliction of pain.'" *Morgan v. Morgensen*, 465 F.3d 1041, 1045 (9th Cir. 2006) (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)). The Eighth Amendment, which protects prisoners from inhumane conditions of confinement, *Farmer v. Brennan*, 511 U.S. 825, 833 (1994), is violated when prison officials act with deliberate indifference to a substantial risk of harm to an inmate's health or safety, *id.* at 828; *Thomas v. Ponder*, 611 F.3d 1144, 1151-52 (9th Cir. 2010); *Richardson v. Runnels*, 594 F.3d 666, 672 (9th Cir. 2010).

Two requirements must be met to show an Eighth Amendment violation. *Farmer*, 511 U.S. at 834. First, the deprivation must be, objectively, sufficiently serious. *Id.* The objective component is contextual and responsive to contemporary standards of decency. *Hudson*, 503 U.S. 1 at 8. Extreme deprivations are required to make out an Eighth Amendment conditions-of-confinement claim. *Hudson*, 503 U.S. at 9. Because routine discomfort is part of the penalty that criminal offenders pay for their offenses against society, only those deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation. *Id.* Second, prison officials must have a sufficiently culpable state of mind, which for conditions-of-confinement claims is one of deliberate indifference. *Farmer*, 511 U.S. at 834. Prison officials act with deliberate indifference when they know of and disregard an excessive risk to inmate health or safety. *Farmer*, 511 U.S. at 837. Thus, prison officials may be held liable under the Eighth Amendment for denying humane conditions of confinement only if they know that inmates face a substantial risk of harm and they disregard that risk by failing to take reasonable measures to abate it. *Id.* at 847.

Inmates have a constitutional right to exercise and the denial of out-of-cell exercise for an extended period of time is sufficiently serious to state a claim under the Eighth Amendment. *Thomas*, 611 F.3d at 1151-52. Short-term, temporary deprivations of exercise without medical effects, however, are not sufficiently serious to support an Eighth Amendment claim. *Thomas*, 611

1   F.3d at 1155; *Norwood v. Vance*, 591 F.3d 1062, 1070 (9th Cir. 2010); *May v. Baldwin*, 109 F.3d

2   557, 565 (9th Cir. 1997); *Allen v. Sakai*, 48 F.3d 1082, 1088 (9th Cir. 1994).[2]

3      Where there has been a particularized safety and security risk, even long-term denials of

4   exercise are permissible. *See Jones v. Garcia*, 430 F. Supp. 2d 1095, 1102-03 (S.D. Cal. 2006)

5   (finding no Eighth Amendment violation where prisoner was denied outdoor exercise for ten months

6   because of ongoing violence); *LeMaire v. Maass*, 12 F.3d 1444, 1458 (9th Cir. 1993) (five year

7   denial of out-of-cell exercise because inmate posed constant threat of attack).

8      The Ninth Circuit has recognized that the temporary denial of outdoor exercise in the course

9   of prison security measures does not amount to an Eighth Amendment violation. *Noble v. Adams*,

10   636 F.3d 525 (9th Cir. 2011); *Norwood*, 591 F.3d at 1066-70. Prison officials have a duty to keep

11   both inmates and staff safe, which must be balanced against other legally-imposed obligations, such

12   as providing outdoor exercise. *Norwood*, 591 F.3d at 1069. "When violence rises to unusually high

13   levels, prison officials can reasonably believe it is lawful to temporarily restrict outdoor exercise to

14   help bring the violence under control." *Id.* Moreover, it is not yet clearly established precisely when

15   a deprivation of outdoor exercise during a particularized safety and security risk becomes objectively

16   unreasonable. *Noble*, 636 F.3d at 529. Thus, both the objective and subjective elements of a prima

17   facie Eighth Amendment claim turn on the reasonableness of a defendant's belief regarding the

18   security measures, and a plaintiff must prove that: (1) a defendant did not actually believe that the

19   restrictions on exercise were necessary; or (2) a defendant's belief was objectively unreasonable. *See*

20   *Farmer*, 511 U.S. at 834; *See also Noble*, 636 F.3d at 529. When evaluating a defendant's belief that

21   programming restrictions were reasonable, the Court cannot "lightly second-guess official's expert

22   judgments about when exercise and other programs could safely be restored." *Norwood*, 591 F.3d

23   at 1069. "Prison officials have a right and a duty to take the necessary steps to reestablish order in

24   a prison when such order is lost." *Noble*, 636 F.3d at 530 (citing *Norwood*, 591 F.3d at 1066-70).

25      Moreover, the Eighth Amendment is not violated if lockdown or modified program measures

26   are either ineffective or maintained for longer than necessary, so long as the defendants reasonably

27

28      [2] Plaintiff in this case is the same plaintiff as in *Norwood v. Vance*.

believed the measures would be effective in stopping the violence. *Norwood*, 591 F.3d at 1069. The issue is not whether the security measures lasted longer than necessary or actually worked. *Id.* Instead, the relevant inquiry is whether the prison official reasonably believed the security measures would be effective in stopping violence. *Id.* "[W]hen it comes to matters of life and death, erring on the side of caution is a virtue." *Id.* Therefore, Defendants' intent is the only relevant inquiry for purposes of Eighth Amendment liability here, not the duration of the lockdown or the reasonableness of the security measures, based upon the benefit of hindsight. *Id.*

### 2. Analysis

Plaintiff has not established a genuine issue of material fact for trial as to his claim against Defendants for Eighth Amendment denial of outdoor exercise. Here, as in *Norwood* and *Noble*, the modified program was implemented and maintained for purposes of investigating the conspiracy to murder a correctional officer on October 7, 2006, and the continued reports that additional violence was being planned against staff, identifying the inmates planning further violence and removing them from the general population, and discovering and confiscating inmate-manufactured weapons that could be used in the attacks.

Following the attempted murder of the correctional officer on October 7, 2006 through the termination of the modified program on February 7, 2007, twenty-three (23) suspicious and alarming incidents continued to transpire involving African-American inmates, including the odor of burning plastic (the weapon used to attack the officer was made from melted plastic), a high number of inmates refusing to shower, confiscation of various inmate-manufactured weapons, verbal and written threats on officers, notes warning of violence and assaults on staff, an African-American inmate committing an assault on another African-American inmate, and African-American inmates fomenting violence in prison. *E.g.,* October 21, 2006 (confiscated razors from ten inmates due to possible inmate-manufactured weapon and an African-American inmate threatened the officer); October 29, 2006 (odor of burning plastic); October 31, 2006 (high number of African-American inmates refused to shower); November 1, 2006 (received note that African-Americans organizing assault on staff); November 2, 2006 (threat from African-American on officer) (odor of burning plastic); November 3, 2006 (odor of burning plastic); November 5, 2006 (high number of African-

American inmates refused to shower) (odor of burning plastic); November 6, 2006 (two African-American inmates were burning items in their cell possibly to make an inmate-manufactured weapon); November 8, 2006 (staff found items in cells believed to be used to melt plastic and manufacture weapons); November 12, 2006 (African-American inmate battered another African-American inmate. During an inventory of the assaulting inmate's property, staff discovered an inmate-manufactured weapon in his bedding); November 17, 2006 (two African-American inmates were aggressive toward staff); December 5, 2006 (actually involved several Hispanic inmates who battered two inmates. Staff discovered several inmate-manufactured weapons, resulting in a second modified program in Facility IVA, which slowed the progress of return to normal program for the first modified program); December 28, 2006 (staff discovered anonymous note that said African-American inmates affiliated with the Crips disruptive group were planning to commit violence upon a return to a normal program); December 29, 2006 (staff received another anonymous note that indicated African-American inmates were conspiring to assault staff); January 4, 2007 (thirteen inmates identified in the December 28, 2006 note were transferred to the Administrative Segregation); January 12, 2007 (staff reported that some outgoing inmate letters suggested that unidentified African-American inmates were still planning to assault staff); January 16, 2007 (cell occupied by African-American inmates contained items consistent with making inmate-manufactured weapons and letters that reflected animosity toward staff); January 18, 2007 (staff reviewed a letter suggesting that African-American inmates may still be planning to assault staff); January 24, 2007 (staff identified an African-American inmate that appeared to be fomenting violence at the prison by circumventing the prison mail procedures to write to inmates that participated in a conspiracy to assault staff and condemned inmates. Staff removed the inmate from the general population to Administrative Segregation, with a recommendation to transfer him to another facility. A search of the inmate's cell revealed an inmate-manufactured weapon); and February 1, 2007 (staff identified three additional African-American inmates who appeared to be fomenting violence at the prison. The inmates were placed in the Administrative Segregation.) (Defs. UF 62, 69-75, 77, 79, 81-82, 86, 88, 90, 92, 97-98, 100, 103, 105; Pl. Opp'n at 29-34, 36-42.)

To establish a prima facie Eighth Amendment claim, a plaintiff must prove that: (1) a

defendant did not actually believe that the restrictions on exercise were necessary; or (2) a defendant's belief was objectively unreasonable. *See Farmer*, 511 U.S. at 834; *See also Noble*, 636 F.3d at 529. When evaluating a defendant's belief that programming restrictions were reasonable, the Court cannot "lightly second-guess official's expert judgments about when exercise and other programs could safely be restored." *Norwood*, 591 F.3d at 1069. "Prison officials have a right and a duty to take the necessary steps to reestablish order in a prison when such order is lost." *Noble*, 636 F.3d at 530 (citing *Norwood*, 591 F.3d at 1066-70). From a review of the record, Plaintiff has not established that Defendants did not actually believe the exercise restrictions were necessary, and the a reasonable juror could not objectively conclude that the Defendants' belief was objectively unreasonable.

Plaintiff contends that violence will not occur if non-affiliated inmates were released twenty (20) inmates at a time on mini concrete yards since they are able to be unrestrained in the law library, medical facility, classification, showers, with no assaults, but Plaintiff offers no evidence to support this allegation. Pl. Opp'n at 15, 20, 23. Defendants submitted signed declarations that following a return to a normal program, violence is most likely to occur on an exercise yard. (Defs. UF 28; Pl. Opp'n at 20.) Until an investigation during the modified program identified and resolved the threat to safety and institutional security, the small concrete exercise yards at CCI were not an alternative to the main exercise yard. (Defs. UF 29; Pl. Opp'n at 20.) Although Plaintiff disputes these statements, Plaintiff is merely speculating and does not have the personal knowledge, foundation, or evidence to refute Defendants' declarations. Fed. R. Evid. 402, 602. Moreover, Plaintiff is not qualified to give an opinion regarding the objective of the modified program, the security concerns at the prison, the subjective intent of other inmates, the conduct of inmates and correctional staff members that Plaintiff did not observe while he was confined to his cell, the evidence collected by staff during the modified program, and Defendants' beliefs and subjective intent. Fed. R. Evid. 402, 602, 701.

The Eighth Amendment is not violated if lockdown or modified program measures are either ineffective or maintained for longer than necessary, so long as the defendants reasonably believed the measures would be effective in stopping the violence. *Norwood*, 591 F.3d at 1069. The issue is

not whether the security measures lasted longer than necessary or actually worked. *Id.* Instead, the relevant inquiry is whether the prison official reasonably believed the security measures would be effective in stopping violence. *Id.* "[W]hen it comes to matters of life and death, erring on the side of caution is a virtue." *Id.* Therefore, Defendants' intent is the only relevant inquiry for purposes of Eighth Amendment liability here, not the duration of the lockdown or the reasonableness of the security measures, based upon the benefit of hindsight. *Id.*

Therefore, Plaintiff has not established a genuine issue of material fact for trial as to his claim against Defendants for Eighth Amendment Outdoor Exercise.

### 3. Supervisory Liability and Linkage

Plaintiff contends that Defendant Tilton, the Secretary for CDCR, and Doe defendant Regional Director,[3] are responsible for Plaintiff's status on a modified program. Defendant Tilton was responsible for overseeing the management and control of the state's correctional system, which included 33 state prisons, 44 conservation camps, and more than 190 parole units and sub-units in 85 locations. Defendant Tilton was responsible for managing a staff which numbered more than 50,000. (Defs. UF 4; Pl. Opp'n at 12.)

Under § 1983, Plaintiff must link the named defendants to the participation in the violation at issue. *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009); *Simmons v. Navajo County, Ariz.*, 609 F.3d 1011, 1020-21 (9th Cir. 2010); *Ewing*, 588 F.3d at 1235; *Jones*, 297 F.3d at 934. Liability may not be imposed on supervisory personnel under the theory of respondeat superior, *Iqbal*, 556 U.S. at 676; *Ewing v. City of Stockton*, 588 F.3d 1218, 1235 (9th Cir. 2009), and administrators may only be held liable if they "participated in or directed the violations, or knew of the violations and failed to act to prevent them," *Taylor*, 880 F.2d at 1045; *accord Starr v. Baca*, 652 F.3d 1202, 1205-08 (9th Cir. 2011); *Corales v. Bennett*, 567 F.3d 554, 570 (9th Cir. 2009); *Preschooler II v. Clark County School Board of Trustees*, 479 F.3d 1175, 1182 (9th Cir. 2007); *Harris v. Roderick*, 126 F.3d 1189, 1204 (9th Cir. 1997).

---

[3] Plaintiff named Doe defendant Regional Director in his first amended complaint, but Plaintiff has never amended his complaint to identify the Doe Defendant or serve the Doe Defendant within the 120-day period prescribed by Rule 4(m) of the Federal Rules of Civil Procedure. Docs. 18, 21, 23.

1    Plaintiff names Defendant Tilton, Secretary of the CDCR, and Doe defendant Regional

2    Director, and makes the vague allegation that the CDCR is responsible for its inmates. Pl. Opp'n at

3    27, Doc. 54. Plaintiff's allegations are insufficient to hold these Defendants liable based on a

4    position of authority as Plaintiff has not alleged any facts linking these Defendants to acts or

5    omissions, which suggest that Defendants participated or directed the violations, or knew of the

6    violations and failed to prevent them. *Iqbal*, 556 U.S. at 676; *Ewing*, 588 F.3d at 1235. Accordingly,

7    Plaintiff has not established a genuine issue of material fact for trial as to his claim against Defendant

8    Tilton, and Doe defendant Regional Director, for Eighth Amendment Outdoor Exercise.

9                                    **4. Qualified Immunity**

10    Government officials enjoy qualified immunity from civil damages unless their conduct

11    violates "clearly established statutory or constitutional rights of which a reasonable person would

12    have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). In ruling upon the issue of qualified

13    immunity, one inquiry is whether, taken in the light most favorable to the party asserting the injury,

14    the facts alleged show the defendant's conduct violated a constitutional right. *Saucier v. Katz*, 533

15    U.S. 194, 201 (2001), *overruled in part by Pearson v. Callahan*, 555 U.S. 223, 227 (2009) ("*Saucier*

16    procedure should not be regarded as an inflexible requirement").

17    The other inquiry is whether the right was clearly established. *Saucier*, 533 U.S. at 201. The

18    inquiry "must be undertaken in light of the specific context of the case, not as a broad general

19    proposition . . . ." *Id.* "[T]he right the official is alleged to have violated must have been 'clearly

20    established' in a more particularized, and hence more relevant, sense: The contours of the right must

21    be sufficiently clear that a reasonable official would understand that what he is doing violates that

22    right." *Id.* at 202. In resolving these issues, the court must view the evidence in the light most

23    favorable to plaintiff and resolve all material factual disputes in favor of plaintiff. *Martinez v.

24    Stanford*, 323 F.3d 1178, 1184 (9th Cir. 2003). Qualified immunity protects "all but the plainly

25    incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

26    Since Defendants are entitled to summary judgment on Plaintiff's constitutional claims,

27    Defendants are also entitled to qualified immunity. The Court finds that Defendants are entitled to

28    qualified immunity under the first prong because when considering the information available to

Defendants at the time of their decision, their conduct did not violate a clearly established statutory or constitutional right of which a reasonable person would have known. *Harlow*, 457 U.S. at 818. Thus, when Defendants were faced with the attempted murder of a correctional officer, a battery of an inmate, and twenty-two (22) other suspicious and alarming incidents involving African-Americans within the four-month span of the modified program, a reasonable person would have continued a modified program in order to protect the safety of the staff and inmates.

### VI. Conclusion and Recommendation

Plaintiff has "failed to point to 'specific facts' in the record that could 'lead a rational trier of fact to find' in his favor. *Matsushita*, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e))." *Beard*, 548 U.S. at 535. Accordingly, pursuant to Rule 56 of the Federal Rules of Civil Procedure, it is HEREBY RECOMMENDED that the Court GRANT Defendants' motion for summary judgment, and that this action be DISMISSED, with prejudice.

These Findings and Recommendations will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1). Within **fifteen (15) days** after being served with these Findings and Recommendations, the parties may file written objections with the Court. The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." A party may respond to another party's objections by filing a response within **fifteen (15) days** after being served with a copy of that party's objections. The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. *Martinez v. Ylst*, 951 F.2d 1153, 1156-57 (9th Cir. 1991).

IT IS SO ORDERED.

Dated:    December 17, 2012

UNITED STATES MAGISTRATE JUDGE